IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 22-73 |
| | : | |
| MICHAEL NIXON | : | |

**MEMORANDUM**

**Judge Juan R. Sánchez**                                                                                    December 4, 2025

On March 1, 2022, Defendant Michael Nixon was indicted on four counts stemming from a robbery of a pharmacy on December 22, 2021. Nixon moves to suppress (1) the robbery victim's out-of-court "show-up" identification (and any in-court identification) and (2) his recorded custodial statement. Because the victim's identification is reliable and because Nixon waived his *Miranda* rights before his voluntary statement, the motion will be denied.

**FINDINGS OF FACT**[1]

1. On December 22, 2021, at approximately 5:39 p.m., Super Drug Pharmacy at 2941 North 5th Street in Philadelphia was robbed at gunpoint. The primary victim, pharmacist C.P., was attempting to exit the pharmacy's back door into a gated employee parking lot when the robbery occurred. Store Video Interior, Ex. 1C; Store Video Rear Entrance, Ex. 1B; N.T. 9/11/25, 15:1-16:10, Dkt. No. 112.

2. A male wearing dark clothing, including black pants with a reflective stripe, a black jacket, and a face mask, was waiting by the back door. As C.P. stepped outside, the

---

[1] The following factual findings are based on the evidence presented at the suppression hearings on May 23, 2024 and September 11, 2025, including: (1) testimony from Philadelphia Police Department (PPD) Detective Thomas Somogyi, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Kyle Raguz, and PPD Officer George Wetzel; (2) surveillance video of the robbery; (3) body-worn camera footage; (4) video and audio recording of Nixon's statement; and (5) law enforcement documents.

masked perpetrator confronted her at gunpoint, grabbed her by the jacket, and forced her back into the pharmacy. Store Video Interior, Ex. 1C; Store Video Rear Entrance, Ex. 1B; N.T. 9/11/25, 15:18-25, 66:19-67:3; Incident Report, Ex. 4.

3. Once inside, the perpetrator led C.P. at gunpoint to the narcotics safe in the pharmacy and ordered her to place controlled substances in a bag he handed to her. Surveillance video shows the perpetrator and C.P. in a well-lit work area, with the perpetrator standing beside and slightly behind C.P. as she opened and emptied the safe. Store Video Interior, Ex. 1C; N.T. 9/11/25, 28:2-29:8; Incident Report, Ex. 4.

4. After C.P. filled the bag with controlled substances from the safe, the perpetrator took the bag and fled through the back door into the parking lot. Surveillance video shows the perpetrator leaving the pharmacy and entering the passenger side of a blue Dodge Charger that was parked nearby. The robbery lasted approximately three minutes. Several pharmacy employees were present in the work area and observed the entire interaction. Store Video Interior, Ex. 1C; Store Video Exterior, Ex. 1D.

5. At the time of the robbery, undercover PPD officers were conducting surveillance in the vicinity. A pharmacy employee, who was returning to the lot and encountered the perpetrator, flagged the officers down and reported that the pharmacy had just been robbed by a man in dark clothing who fled in a blue Dodge Charger. N.T. 9/11/25, 15:18-16:10; Store Video Exterior, Ex. 1D.

6. The undercover officers quickly located the blue Charger and attempted a vehicle stop. The driver did not yield, and a high-speed chase, involving at least three police vehicles, ensued. The chase eventually ended when the blue Charger collided with a minivan on the 3100 block of Janney Street. Officers converged on the vehicle and detained the

    driver and passenger around 6:04 p.m. The passenger was later identified by police as Defendant Nixon, and the driver was later identified by police as his girlfriend. At the time he was detained, Nixon was wearing a white T-shirt, black track pants with a reflective stripe, and black shoes. A black puffy jacket was also recovered from the vehicle. The time from the perpetrator's exit to the crash was approximately 20 minutes. Officer Czarnecki BWC, Ex. 8 at 00:40-31:50; Nixon Arrest Report, Ex. 10; Nixon Photo, Ex. 8A.

7. As officers were pursuing the blue Charger, other PPD officers, Officers George Wetzel and Sylvester White, responded to the scene of the robbery around 5:48 p.m. and spoke with C.P. C.P. gave her account of the robbery, including a description of the perpetrator: six feet tall, Black, stocky,[2] beard, black jacket, black mask, black pants, black sneakers, and a black backpack. N.T. 9/11/25, 59:16-23; Officer Wetzel BWC, Ex. 7; Incident Report, Ex. 4; Crime Scene Log, Ex. 5.

8. Approximately 20 minutes after the robbery, C.P. was transported in a police vehicle to the scene of the crash to participate in a show-up identification procedure. During the car ride, C.P., who was separated by a partition, was in the presence of officers who were monitoring and responding to police radio traffic about the pursuit and arrest of the robbery suspect. The radio transmissions and officers' brief comments referenced a male suspect, the Charger, and aspects of the pursuit. N.T. 9/11/25, 69:13-70:23;

---

[2]     The Incident Report, completed by Officers Wetzel and White, states that C.P. described the perpetrator as stocky. Incident Report, Ex. 4. Officer White's body camera captures C.P. and two other complainants describing the perpetrator as skinny. Officer White BWC, Ex. 11 at 12:50-13:00. In her interview after the show-up, C.P. described the perpetrator as having a "stockier build." Investigation Interview Record, Ex. 2.

Officer Wetzel BWC, Ex. 7 at 20:40-30:30; Officer White BWC, Ex. 11 at 21:45-30:00.

9. When C.P. arrived at the scene around 6:18 p.m., it was dark outside. The scene was illuminated by streetlights, police vehicle headlights, and police emergency lights. There were numerous police vehicles and officers present. N.T. 9/11/25, 71:2-18, 92:21-93:7; Officer Wetzel BWC, Ex. 7 at 30:00; Officer Czarnecki BWC, Ex. 8 at 30:00-35:00.

10. C.P.'s vehicle was parked a short distance from where Nixon was being detained. C.P. remained inside the vehicle during the procedure. A handcuffed Nixon was taken out of a police vehicle and shown to C.P. Nixon was surrounded by police officers. Officer Wetzel BWC, Ex. 7 at 32:00-35:30; Officer White BWC, Ex. 11 at 31:00-36:30.

11. When C.P. first observed Nixon, he was wearing a white T-shirt, black pants with a reflective stripe, and black shoes, but no jacket. C.P. noted that the pants and shoes appeared consistent with what she saw during the robbery. However, she expressed uncertainty because the perpetrator wore a black puffy jacket, and her view of his face was partially obscured by a face mask. Officers reminded C.P. that she needed to be "100 percent sure" before making an identification. N.T. 9/11/25, 81:6-84:25, 86:18-88:14; Officer Wetzel BWC, Ex. 7 at 32:00-35:30; Officer White BWC, Ex. 11 at 31:00-36:30.

12. After C.P. commented that the absence of the black jacket made her uncertain, officers retrieved the black jacket recovered from the blue Charger and draped it over Nixon's shoulder. Upon seeing Nixon in the jacket along with the pants and shoes, C.P. identified Nixon as the perpetrator. C.P.'s identification was about 40 minutes after the

perpetrator left the pharmacy. There is no evidence indicating officers told C.P. that Nixon was the perpetrator or that she must identify him. N.T. 9/11/25, 74:24-75:17; Officer Wetzel BWC, Ex. 7 at 32:00-35:30; Officer White BWC, Ex. 11 at 31:00-36:30.

13. The Court finds Officer Wetzel's testimony was corroborated by surveillance video, body camera footage, and police reports. Accordingly, the Court finds his testimony credible in all respects.

14. Approximately one hour after the identification, Detective Hoover interviewed C.P. and prepared a record of the interview. In that statement, C.P. described the perpetrator as a Black male about six feet tall with a stocky build, possibly with a beard, and wearing distinctive dark pants with a reflective stripe and a black face mask that covered most of his face. She stated that at the show-up she recognized the same pants. Interview Investigation Record, Ex. 2.

15. Following the show-up, Nixon was transported to the East Detective Division about three hours after the robbery. Around 8:50 p.m., Detective Thomas Somogyi and his partner interviewed Nixon in a standard interview room. The interview lasted about 25 minutes and was video- and audio-recorded. N.T. 5/23/24, 19:20-26:22, 43:10-25, Dkt. No. 84.

16. Before questioning, the detectives presented Nixon with a written Miranda waiver form. Detective Somogyi read Nixon his rights, line by line, and Nixon indicated he understood each right. Nixon initialed each line and signed the waiver form. He also signed a second page acknowledging he had not been promised anything or threatened and that he wished to speak with the detectives. N.T. 5/23/24, 26:25-32:4.

17. Detective Somogyi, a veteran officer with extensive experience dealing with intoxicated individuals, testified that Nixon appeared awake, alert, and oriented during the interview. Nixon did not slur his words, nod off, or exhibit physical signs of intoxication such as bloodshot eyes, difficulty focusing, or an unsteady gait. Detective Somogyi saw nothing to indicate Nixon was under the influence of drugs or alcohol. N.T. 5/23/24, 32:16-47:14.

18. During the interview, Nixon confessed that he robbed the pharmacy, fled in the blue Charger, and discarded narcotics during the chase. He also insisted the driver was not involved in the robbery. He did not request a lawyer, did not ask to stop the questioning, and did not tell the detectives he was too impaired to understand. There is no evidence the detectives made threats, promises, or used force. The tone of the interview, as reflected on the video and described by Detective Somogyi, was conversational. N.T. 5/23/24, 54:13-64:22.

19. Detective Somogyi's testimony was corroborated by a video and audio recording of Nixon's custodial statement and a signed waiver form. Accordingly, the Court finds his testimony credible in all respects.

**LEGAL STANDARDS**

A suggestive pretrial identification procedure may violate due process if it creates a "substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977). This is a two-step inquiry. First, the court determines whether the identification procedure was unnecessarily or impermissibly suggestive. *United States v. Maloney*, 513 F.3d 350, 355 (3d Cir. 2008). Second, if the procedure is suggestive, the court then considers whether, under the totality of circumstances, the identification is nonetheless reliable. *Neil v. Biggers*, 409 U.S. 188,

199 (1972). To determine reliability, the court applies the following factors: (1) the witness's opportunity to view the perpetrator; (2) the witness's degree of attention; (3) the accuracy of any prior description; (4) the level of certainty demonstrated at the time of identification; and (5) the time between the crime and the confrontation. *United States v. Hall*, 28 F.4th 445, 454 (3d Cir. 2022). An identification is only excluded if the indicia of reliability are so "outweighed by the corrupting effect" of the suggestive procedure. *Brathwaite*, 432 U.S. at 116; *see also Hall*, 28 F.4th at 454 ("[D]ue process requires the suppression of an identification only if it was obtained pursuant to a suggestive process that in turn raises serious questions about the reliability of the resulting identification."). Where there was no prior suggestive pretrial identification, the Supreme Court has declined to extend due process exclusion to the in-court identification. *Perry v. New Hampshire*, 565 U.S. 228, 245-48 (2012) (finding that concerns about suggestiveness in the courtroom are addressed by "safeguards built into our adversary system that caution juries against placing undue weight on eyewitness testimony of questionable reliability").

Turning to the custodial statement, a defendant must be warned of his right against self-incrimination and his right to an attorney before he can be subjected to custodial interrogation by law enforcement. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Government must prove by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights and that his statement was the product of a free and deliberate choice, rather than coercion. *Colorado v. Spring*, 479 U.S. 564, 572-73 (1987); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). Courts assess the validity of a waiver by looking "at the facts of the particular case, including the background, experience, and conduct of the suspect," as well as prior dealings with the criminal justice system. *Velasquez*, 885 F.2d at 1086. "An express written

7

or oral statement of waiver . . . is usually strong proof of the validity of [a defendant's] waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

A statement is involuntary only where the defendant's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Courts consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A defendant's mental state, standing alone, does not render a confession involuntary absent coercive police conduct. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *see, e.g.*, *United States v. Tucker*, 12 F.4th 804, 820 (D.C. Cir. 2021) ("The mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary." (citations and quotations omitted)); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (finding that "intoxication and fatigue alone do not automatically render a confession involuntary"); *Coddington v. Sharp*, 959 F.3d 947, 959 (10th Cir. 2020) (explaining that "the mere fact of drug or alcohol use will not render a confession unknowing or involuntary," and "drug use will only render a confession unknowing if it rises to the level of substantial impairment").

**DISCUSSION**

Nixon argues the show-up was suggestive and unreliable because C.P.'s observation was brief, her initial description was vague, and her show-up identification was tentative. Def.'s Mot. Suppress 1-11, Dkt. No. 47. The Government stresses C.P. had an opportunity to view the perpetrator during the robbery, she gave an accurate description of the perpetrator, and she identified Nixon shortly after the robbery. Gov't Opp. 5-14, Dkt. No. 50. The Government argues that, even if the show-up was unduly suggestive, C.P.'s identification of Nixon is reliable. *Id*.

The Court agrees with Nixon that the show-up was unduly suggestive. Nixon was handcuffed, flanked by multiple officers, illuminated by police lights, and presented as the sole suspect. *See United States v. Brownlee*, 454 F.3d 131, 138 (3d Cir. 2006) (finding that show-up procedure where defendant was sole suspect presented to witness at the scene of an accident while handcuffed and surrounded by police officers was unduly suggestive). Further increasing the risk of suggestiveness, on the way to the show-up, C.P. was in the patrol car when radio traffic relayed information indicating that a suspect was apprehended, and the officers in the car made brief comments that tended to confirm that a suspect was apprehended. When C.P. expressed uncertainty, particularly about the absence of the black jacket, officers retrieved a black jacket from the blue Charger and draped it over Nixon, after which C.P. definitively identified him. Officers also told C.P. she had to be "100 percent sure" of the identification, which, while seemingly cautionary, could be reasonably perceived as pressure to identify Nixon. Taken together, the Court concludes that the show-up procedure was unduly suggestive.

However, the Court agrees with the Government that, considering the reliability factors, C.P.'s identification of Nixon is reliable. First, C.P. had multiple opportunities to observe the perpetrator at close range during the robbery. C.P. and the perpetrator were in a well-lit pharmacy for approximately three minutes, with the perpetrator standing close to C.P. as she opened the safe and filled the bag. Although the perpetrator wore a mask that hid some facial features, C.P. could see his eyes, upper face, build, height, complexion, body movements, and distinctive clothing while the perpetrator stood within arm's length.

Second, shortly after the robbery, C.P. described the perpetrator as a Black male, approximately six feet tall with a possibly stocky build, wearing a black face mask, black jacket, and black pants. Her later recorded statement to Detective Hoover after the show-up added that

9

the pants were dark with a reflective stripe. While the reflective stripe detail was documented only after the show-up and may have been influenced by Nixon's appearance at the show-up, the core elements of C.P.'s initial description—race, approximate height and build, beard, clothing type, use of mask, and pants—are consistent with the surveillance footage and Nixon's appearance at the show-up.

Third, C.P. immediately recognized Nixon's pants, shoes, and general build, even though she initially expressed hesitation that Nixon was the perpetrator. After seeing Nixon with the black jacket draped over him, together with the pants and shoes she had already noted, she stated with definitive certainty that Nixon was the perpetrator. Although her initial hesitation and increased certainty after the jacket was added reflect the potential influence of the suggestive aspects of the procedure, they also reflect C.P.'s reconciliation of what she saw during the robbery with what she saw at the show-up. On balance, this factor supports reliability because it establishes that her identification was the product of her own memory and not just suggestion. And fourth, the show-up occurred approximately 40 minutes after the robbery, while the event was fresh in C.P.'s mind. Such temporal proximity generally enhances reliability. See *Brathwaite*, 432 U.S. at 115.

Considering the reliability factors, the Court concludes that C.P.'s identification is sufficiently reliable to be presented to the jury. C.P. had a meaningful opportunity to view the perpetrator at close range in good lighting, her core description matches surveillance video and Nixon's appearance, and the show-up occurred very soon after the robbery. The defense's concerns about procedure are appropriately explored through challenges at trial, rather than exclusion. *See Perry*, 565 U.S. at 245-48. Accordingly, Nixon's motion to suppress C.P.'s out-of-court identification and prevent C.P.'s in-court identification will be denied.

Next, the Court turns to Nixon's custodial statement. Nixon argues his statement was involuntary because he was under the influence of narcotics or in severe withdrawal, and detectives exploited this condition to extract the statement. Def.'s Mot. Suppress 21-23. The record, however, does not support Nixon's claim.

First, Nixon knowingly and intelligently waived his *Miranda* rights. Detective Somogyi advised Nixon of his Miranda rights orally and used a written form. Nixon indicated he understood each right, initialed each line, and signed the waiver. He also signed a separate agreement acknowledging that his statement was not induced by threats or promises. Nixon is an adult, about 27 years old at the time of the statement, with a high school education, some college credits, and substantial prior experience with the criminal legal system, including multiple felony convictions. Nothing in the record suggests he lacked the education or intelligence to understand the warnings.

Second, Nixon's statement was voluntary. The interview began roughly three hours after Nixon was arrested. It lasted approximately 25 minutes. Video of the statement and Detective Somogyi's testimony portray a calm, conversational tone throughout the interview. Nixon spoke clearly, corrected details, asked questions about next steps, and attempted to negotiate his girlfriend's liability. All of this indicates that Nixon was thinking strategically and not simply being coerced. Furthermore, Nixon did not present any medical, toxicological, or expert evidence that he was so intoxicated or in withdrawal such that he could not understand his rights or the detectives' questions. During the interview, he did not claim that he was too impaired to continue, nor did he request to stop or ask for counsel. The only evidence of intoxication is Nixon's own self-serving assertion after the fact, which is outweighed by Detective Somogyi's credible testimony and the video of the statement. There is likewise no evidence of coercive police conduct. Detectives did not threaten Nixon, promise leniency, or employ physical or psychological pressure.

They did not subject him to prolonged questioning, sleep deprivation, or other coercive tactics. Rather, the evidence here shows Nixon was alert, understood and waived his *Miranda* rights, and chose to speak with detectives. On this record, the Court finds that he waived his *Miranda* rights, and his statement was voluntary.

**CONCLUSIONS OF LAW**

1. The show-up procedure was unduly suggestive, but C.P.'s identification of Nixon is reliable.
2. Nixon knowingly and intelligently waived his Miranda rights before his custodial statement.
3. Nixon's custodial statement was voluntary.

Therefore, Nixon's motion to suppress is denied. An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.